AMOCO PRODUCTION COMPANY and
Amoco Oil Company, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
ENERGY et al., Defendants.

NORTHERN NATURAL GAS
COMPANY et al., Plaintiffs,

v.

James SCHLESINGER et al.,
Defendants.

EXXON CORPORATION and Sun Oil
Company (Delaware), Plaintiffs,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

MOBIL OIL CORPORATION and Mobil
Oil Exploration & Producing
Southeast, Inc., Plaintiffs,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

GULF OIL COMPANY, Plaintiff,

v.

UNITED STATES DEPARTMENT OF
ENERGY et al., Defendants.

SHELL OIL COMPANY, a Delaware
Corporation, Plaintiff,

v.

UNITED STATES DEPARTMENT OF
ENERGY et al., Defendants.

AMINOIL USA, INC. (a Delaware
Corporation), Plaintiff,

v.

The UNITED STATES DEPARTMENT
OF ENERGY et al., Defendants.

ATLANTIC RICHFIELD COMPANY,
Plaintiff,

v.

UNITED STATES DEPARTMENT OF
ENERGY et al., Defendants.

CONTINENTAL OIL COMPANY,
Plaintiff,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

Civ. A. Nos. 78–463, 78–464, 78–466,
78–471, 78–515, 78–519, 78–530,
78–532 and 79–47.

United States District Court,
D. Delaware.

April 20, 1979.

William O. LaMotte, III, and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Roger L. Taylor, Chicago, Ill., and Robert F. VanVoorhees of Kirkland & Ellis, Washington, D. C.; Matthew J. Gallo, Amoco Oil Co., Chicago, Ill., for Amoco in Civ. A. No. 78–463; Daniel Joseph and Harry Silver of Akin, Gump, Hauer & Feld, Washington, D. C.; Fredi L. Pearlmutter, New York City, Mobil Oil Corp., for Mobil in Civ. A. No. 78–471.

Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del., Richard G. Morgan and Donald S. Arbour of O'Connor & Hannan, Washington, D. C., for Northern Natural in Civ. A. No. 78–464; Kenneth L. Bachman, Jr., and Eugene M. Goott of Cleary, Gottlieb, Steen & Hamilton, Washington, D. C.; John R. Cope and Thomas F. Holt, Jr. of Bracewell & Patterson, Washington, D. C., for Aminoil in Civ. A. No. 78–530.

Thomas Herlihy, III of Herlihy & Herlihy, Wilmington, Del., William M. Parse, Jr., of Fulbright & Jaworski, Houston, Tex., Barbara Finney, Exxon Corp., Houston, Tex., for Exxon/Sun in Civ. A. No. 78–466; David L. Roll, of Steptoe & Johnson, Washington, D. C., for Atlantic Richfield in Civ. A. No. 78–532.

Charles F. Richards, Jr. of Richards, Layton & Finger, Wilmington, Del., William E. Wickens and Frederick S. Frei of Howrey & Simon, Washington, D. C., for Shell Oil in Civ. A. No. 78–519; Charles E. Cheek, Gulf Oil Corp., Tulsa, Okl., for Gulf Oil in Civ. A. No. 78–515.

John P. Sinclair and Charles S. Crompton, Jr. of Potter, Anderson & Corroon, Wilmington, Del., Donald B. Craven and Robert K. Huffman of Miller & Chevalier, Washington, D. C., for Continental Oil in Civ. A. No. 79–47.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Don W. Crockett, James R. Myers and Michael P. Phillips, U. S. Dept. of Energy; Dina R. Lassow, U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

STAPLETON, District Judge:

These pre-enforcement review actions challenge portions of Subpart K of the United States Department of Energy's ("DOE") Mandatory Petroleum Pricing Regulations, 10 C.F.R. § 212.161 *et seq.*, and

DOE's interpretation of that subpart.[1] Subpart K regulates the pricing of natural gas liquids ("NGLs") and natural gas liquid products ("NGLPs"). Nine such actions have been filed in this Court.[2] The plaintiffs bringing these nine actions fall into two distinct groups. The *Northern* and *Aminoil* cases involve gas plant operators (or "processors") which do not refine crude oil. *See* 10 C.F.R. § 212.161(b)(1). The aspects of Subpart K challenged in those two cases are discussed in *Northern Natural Gas Co. v. DOE*, 464 F.Supp. 1145 (D.Del., 1979). The remaining seven cases involve crude oil refiners which are also gas plant operators. *See* 10 C.F.R. § 212.161(b)(2). Those seven cases raise the single issue of whether the adjusted and imputed first sale prices of 10 C.F.R. § 212.164 may be utilized by the plaintiffs in their inter-affiliate transfers.[3] DOE has moved to dismiss or to transfer to the United States District Court for the District of Columbia the *Amoco, Exxon/Sun, Mobil, Gulf, Shell* and *ARCO* actions, and to transfer to the United States District Court for the District of Columbia the *Northern, Aminoil* and *CO-NOCO* cases. Those motions are currently before the Court.

## I. THE SUBPART K LITIGATION.

In order to understand the nature of DOE's motions, it is necessary to review the history of Subpart K and the litigation which it has inspired. The original Subpart K regulations were promulgated on December 19, 1974 and became effective on January 1, 1975. *See* 39 Fed.Reg. 44407 (December 24, 1974). The first section of Subpart K, now 10 C.F.R. § 212.161, established its scope and relationship to other subparts. It provided, in part:

(a) *Scope.* This subpart applies to all sales of natural gas liquids and natural gas liquid products, including transfers between affiliated entities, by all firms, including gas plant operators, producers of natural gas, natural gas royalty owners and refiners except sales by resellers or retailers, which are subject to Subpart F of this part.

(b) *Relationship to other Subparts—*

(1) *Gas plant operators.* Refiners that only refine liquid hydrocarbons from oil and gas field gases and do not refine crude oil shall determine their maximum lawful selling prices pursuant to this Subpart K and are not also subject to Subpart E.

(2) *Crude oil refiners which are also gas plant operators*—(i) *General.* Refiners that refine liquid hydrocarbons from oil and gas field gases, and also refine crude oil, shall determine their May 15, 1973 selling prices and increased costs for natural gas liquids and for natural gas liquid products produced in gas plants pursuant to this subpart, but shall determine their maximum lawful selling prices pursuant to Subpart E.

With respect to the formula used to determine the "May 15, 1973 selling prices" for NGLs and NGLPs, those regulations also specified a "first sale" base price which was the higher of (1) the weighted average of prices the gas plant operator received from different "classes of purchaser" on May 15, 1973; (2) an "adjusted first sale price" of 8.5 cents per gallon for propane, 9.0 cents for butane, and 10.0 cents for natural gaso-

---

1. For a review of the regulatory background, *see Northern Natural Gas Co. v. DOE*, 464 F.Supp. 1145 (D.Del., 1979).

2. *Amoco Production Co. and Amoco Oil Co. v. DOE*, Civil Action No. 78–563 ("*Amoco*"); *Northern Natural Gas Co., Northern Gas Products Co., and Northern Propane Gas Co., and UPG, Inc. v. DOE*, Civil Action No. 78–464 ("*Northern*"); *Exxon Corp. and Sun Oil Co. v. DOE*, Civil Action No. 78–466 ("*Exxon*", "*Sun*"); *Mobil Oil Corp. and Mobil Oil Exploration & Producing Southeast, Inc. v. DOE*, Civil Action

No. 78–471 ("*Mobil*"); *Gulf Oil Corp. v. DOE*, Civil Action No. 78–515 ("*Gulf*"); *Shell Oil Co. v. DOE*, Civil Action No. 78–519 ("*Shell*"); *Aminoil USA, Inc. v. DOE*, Civil Action No. 78–530 ("*Aminoil*"); *Atlantic Richfield Co. v. DOE*, Civil Action No. 78–532 ("*ARCO*"); and *Continental Oil Co. v. DOE*, Civil Action No. 79–47 ("*CONOCO*").

3. This issue will be referred to as either the "first sale" issue or the "transfer pricing" issue.

line; and, where applicable, (3) a higher "imputed price" for NGLs from plants which were not constructed before, or which were significantly expanded after, Subpart K's effective date of January 1, 1975. *See* 10 C.F.R. § 212.164. "First sale" was defined in what is now 10 C.F.R. § 212.162 as follows:

"First sale" means, with respect to natural gas liquids or natural gas liquid products, the first transfer for value to a class of purchaser for which a fixed price per unit of volume is determined.

The parties agree that as far as sales of NGLs and NGLPs from both refiners and processors to unaffiliated purchasers are concerned, the adjusted first sale prices of Section 212.164 are available in determining the May 15, 1973 selling prices. From the effective date of Subpart K, plaintiffs have read Section 212.161 to provide exactly the same treatment for sales to affiliated purchasers. The DOE maintains that inter-affiliate transfers have never constituted "first sales." As noted above, the single issue raised in the seven cases brought by the refiners is whether inter-affiliate transfers are first sales under Subpart K. The first sale issue is also raised in the two cases brought by processors, along with several other issues.

Shortly after Subpart K became effective, in July of 1975, Exxon Corporation ("Exxon") filed an action against the Federal Energy Administration ("FEA"), the predecessor of DOE, in the United States District Court for the Northern District of Texas ("the Texas action").[4] That action raised at least five issues concerning the application of Subpart K. However, none of the issues raised in this Court, including the first sale issue, have been raised in the Texas action. Exxon claims that the first sale issue was not raised in that case because it did not become an issue until three years after the filing of that action.

In order to understand how the first sale litigation did come about, it is helpful to review the attempts of the plaintiffs to get

a ruling on the first sale issue from 1975 to the present. On January 23, 1975, an attorney for Atlantic Richfield Co. ("ARCO") wrote to an official at the FEA, confirming the ground covered at a meeting between FEA and ARCO officials on January 8, 1975 concerning the new Subpart K. That letter stated in part:

With respect to base price determination, it was confirmed that the NGL regulations are consistent with the crude oil regulations relating to identification of costs incurred by refiners and other producers of natural gas liquids for purposes of calculating costs which are recoverable under the provisions of Subpart E of Part 212 in the regulations. That is to say, Section 212.141(a) [now 212.161(a)] establishes the first sale to include transfers between affiliated entities.

ARCO and the other plaintiffs have consistently used the first sale price in transfers between affiliated entities from that time.

Since 1976, three of the plaintiffs have requested interpretations on the first sale issue. In early 1976, an FEA auditor asserted that Northern Natural Gas Co. ("Northern") and its three subsidiaries were a single firm for Subpart K purposes, and that there was no first sale until there was a sale to an unaffiliated third party. On February 10, 1976, Northern and its subsidiaries requested an interpretation of that question from FEA's Office of General Counsel.

On April 5, 1976, Continental Oil Co. ("CONOCO") requested an interpretation from FEA's Office of General Counsel regarding the May 15, 1973 selling prices of commingled NGLs and NGLPs under Subpart K. That request for interpretation asked whether the first sale prices of Section 212.164 were available for all of its sales of NGLs and NGLPs, and for NGLs and NGLPs manufactured in its gas plants and used by the firm in its crude oil refineries.

---

4. Other plaintiffs in the Texas action include Dorchester Gas Producing Co. and Dorchester Gas Processing Co., Phillips Petroleum Co., and Pennzoil Co.

In March of 1978, a DOE official and DOE auditors told ARCO officials that DOE considered the first sale as occurring only at the first transfer between non-affiliated entities. As a result, on May 18, 1978, ARCO requested an interpretation from DOE's Office of General Counsel, pursuant to 10 C.F.R. § 205.80, *et seq.*, which also presented the first sale issue. Noting the "substantial impact on the pricing practices of many firms," DOE published a Notice of Request for Comment on ARCO's request for an interpretation. 43 Fed.Reg. 28518 (June 30, 1978).

On June 2, 1978, DOE issued Interpretation 1978–29 to CONOCO. 43 Fed.Reg. 29529 (July 10, 1978). That interpretation noted that the first sale adjusted prices of Section 212.164 "do not apply to intra-firm transfers." The plaintiffs contend that that statement, published in July of 1978, was the first public statement of DOE's current position on the first sale issue.

On September 14, 1978, DOE issued a final rule amending Subpart K. *See* 43 Fed.Reg. 42984 (September 21, 1978). That amendment, effective November 1, 1978, contained two changes which are relevant to the first sale issue. First, a definition of "firm" was added to Subpart K. 10 C.F.R. § 212.162 states:

> "Firm" means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.

DOE also devoted ten columns of its preamble to the first sale issue, concluding that to make "explicit" what had always been "implicit", the phrase "including transfers between affiliated entities" was being deleted from the scope section, Section 212.161(a).

Upon publication of the Subpart K amendments, several of the plaintiffs petitioned DOE to suspend the effective date of the amendments.

On October 30, 1978, two days before the effective date of the amendments, the *Amoco* and *Northern* complaints were filed in this Court. On that date, DOE also filed a "Suspension of Effective Date of Amendment" regarding the deletion of the phrase "including transfers between affiliated en-

tities" from 10 C.F.R. § 212.161(a). *See* 43 Fed.Reg. 50841 (October 31, 1978). At the same time, DOE noticed a hearing for December 7, 1978 to receive comments on whether "the prohibition of transfer pricing under Subpart K should be eliminated or modified." DOE also stated that it was adhering to its "position that the prior regulations did not permit transfer pricing." The notice went on to state that "accordingly, neither the amendment deleting this phrase nor the suspension of the effective date of this amendment represents a substantial change." 43 Fed.Reg. 50843.

The *Exxon Sun* action was filed on November 1, 1978, and the *Mobil* action was filed on November 6, 1978. On November 17, 1978, DOE issued Interpretation 1978–61 to ARCO. *See* 43 Fed.Reg. 57583 (December 8, 1978). After a rather lengthy discussion of the transfer pricing issue, DOE concluded that "intra-firm transfers are not first sales . . . .".

The *Gulf* action was filed on November 27, 1978, the *Shell* action was filed on December 1, 1978, and the *Aminoil* action was filed on December 13, 1978. The *ARCO* action was also filed on December 13, 1978, immediately after Interpretation 1978–61 was final for review pursuant to 10 C.F.R. § 205.85. The *CONOCO* action was filed on January 24, 1979.

On December 13, 1978, DOE issued Interpretation 1978–63 to Northern. *See* 44 Fed. Reg. 3023 (January 15, 1979). In that Interpretation, DOE concluded that:

> (3) Sales of NGL's and NGLP's between affiliated entities within the Northern . . . firms were not "first sales" subject to the first sale price rules of Subpart K;
>
> (4) The Northern . . . firms may not have used the adjusted May 15, 1973, prices of 10 C.F.R. § 212.164 in lieu of actual May 15, 1973 weighted average prices for NGL's and NGLP's transferred between gas processing and marketing entities within either firm;

44 Fed.Reg. at 3029.

By the Spring of 1978, DOE had completed an NGL audit of Exxon and began administrative enforcement proceedings

against that company.[5] When DOE learned that Exxon was about to file an action in this Court regarding the first sale issue,[6] DOE removed its enforcement proceedings from the administrative forum to the United States District Court for the District of Columbia. As a result, Exxon did not file its action here against the DOE until sixteen minutes after the DOE had removed its enforcement action to the District of Columbia Court on November 1, 1978. On January 5, 1979, DOE brought enforcement actions under Subpart K against eight other defendants in the District of Columbia Court. Those defendants include Shell Oil Co. ("Shell"), Standard Oil Company of Indiana ("Standard"), the parent of the Amoco companies, ARCO, Mobil Oil Corp. ("Mobil") and Gulf Oil Corp. ("Gulf").[7]

In the District of Columbia enforcement actions, DOE has made a number of claims against the nine defendants. While the actions against Exxon, Shell, Standard, ARCO, Mobil and Gulf do raise the first sale issue, they also raise several other issues dealing with increased costs of natural gas shrinkage, non-product cost increases and product cost increases under Subpart K, which are not raised in this Court. The District of Columbia enforcement actions do not raise the other issues raised here in the *Northern* and *Aminoil* actions.

Some of the issues raised in the District of Columbia enforcement actions (other than the first sale issue) are also raised in the Texas action. On November 16, 1978, Exxon moved the District of Columbia Court to stay, transfer to the Northern District of Texas, or dismiss the enforcement action against it. Subsequently, DOE moved the Texas Court to transfer the Tex-

as action to the District of Columbia. No hearing date has been set on the DOE motion in the Texas action.

In the District of Columbia enforcement actions, on February 13, 1979, Exxon, Gulf and three other defendants moved the Court to dismiss for lack of jurisdiction. On the same date, Shell, ARCO, Mobil, Gulf and three other defendants moved the Court to stay the enforcement actions or to sever the various claims and to transfer portions of those claims to the Northern District of Texas and the first sale portions to this Court. A March 30, 1979 hearing was held on those motions. At the conclusion of the hearing, Judge Gesell made the following rulings regarding the oil companies' motions.

With regard to the contention that the District of Columbia Court lacked jurisdiction over the enforcement actions, Judge Gesell denied the motion to dismiss. However, he did indicate that the jurisdictional issue was "not free from doubt." He stated:[8]

I am forced to the conclusion that the Court does have jurisdiction and I so hold.

\* \* \* \* \* \*

What, accordingly, the Court is going to do is, as I said, to acknowledge the existence of jurisdiction.

Since we have years of litigation ahead in this case and since the issue is not free from doubt, as the excellent briefs of the parties have indicated, I am going to certify this question of the Court's jurisdiction to TECA under the provisions of 28 U.S.C. § 1292(b).

Judge Gesell also denied the motions to sever and transfer.[9] With regard to the

---

**5.** Exxon sought, unsuccessfully, to have the administrative enforcement proceedings enjoined by the United States District Court for the Northern District of Texas.

**6.** At a hearing before this Court on October 31, 1978, in the *Amoco* and *Northern* cases, Exxon announced that it intended to file an action here.

**7.** DOE has not initiated enforcement actions against CONOCO or Sun Oil Co. ("Sun"), or

against any of the *Northern* or *Aminoil* plaintiffs. The other defendants in the District of Columbia who are not plaintiffs here are Texaco, Inc., Phillips Petroleum Co., and Cities Service Co.

**8.** Transcript of Argument of March 30, 1979, pp. 130–31.

**9.** *Id.*, p. 132.

motions to stay the enforcement actions, the Court stated: [10]

I am satisfied that the District Courts both in Texas and Delaware are well advanced on a resolution of what are threshold questions in this litigation, questions that must be decided before any aspect of this case proceeds.

I have determined that I will, accordingly, stay those proceedings until those courts act on the issues now pending before them or until, in response to the motions to transfer which have been filed, those courts determine to transfer their problems to this Court.

\*　　\*　　\*　　\*　　\*　　\*

.  .  .  once the District Courts [in Texas and Delaware] have acted, it is my present intention, depending on developments, of course, to activate and activate vigorously the proceedings here in this Court. I, therefore, do not believe the stay will be of substantial duration. .  .

## II. VENUE.

Initially, DOE argues that since Amoco Oil Co., Exxon, Mobil, Gulf and ARCO are not incorporated in Delaware,[11] they are not properly venued here. The relevant venue statute, 28 U.S.C. § 1391(e), provides:

A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

All of the plaintiffs in the nine actions brought in this Court assert venue in this district under Section 1391(e)(4).

10. *Id.,* p. 133.

11. Amoco Oil Co. is incorporated in Maryland, Exxon in New Jersey, Mobil in New York, Gulf and ARCO in Pennsylvania.

■ The five plaintiffs listed above fall into two separate categories for venue purposes. Amoco Oil Co., Exxon and Mobil all have co-plaintiffs which are incorporated in Delaware.[12] Gulf and ARCO have no co-plaintiffs.

In *Exxon Corp. v. F. T. C.,* 588 F.2d 895 (3d Cir. 1978), the Third Circuit dealt with a contention similar to the one which DOE raises here, i. e., that each plaintiff must meet the Section 1391(e) venue requirements independently. The Court there stated:

With respect to the first contention, requiring every plaintiff in an action against the federal government or an agent thereof to independently meet Section 1391(e)'s standards would result in an unnecessary multiplicity of litigation. The language of the statute itself mandates no such narrow construction. There is no requirement that all plaintiffs reside in the forum district. See *Kenyatta v. Kelley,* 430 F.Supp. 1328, 1330 n. 7 (E.D.Pa.1977); *Candarini v. Attorney General,* 369 F.Supp. 1132, 1135 (E.D.N.Y. 1974).

588 F.2d 898–9. That court concluded:

we hold that venue is proper for this action because at least one plaintiff did reside in Delaware.

588 F.2d at 899. Under *Exxon v. F. T. C.,* Amoco Oil Co., Exxon and Mobil are properly venued in Delaware.

■ As noted above, Gulf and ARCO do not have Delaware corporations as co-plaintiffs. However, they argue that incorporation is not a prerequisite to residence for Section 1391(e)(4) venue purposes. In support of that position, they point to 28 U.S.C. § 1391(c), which provides:

A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regard-

12. Amoco Production Co., Sun, and Mobil Oil Exploration & Producing Southeast, Inc. are all Delaware corporations.

ed as the residence of such corporation for venue purposes.

Gulf and ARCO argue that under that provision, since they both do business in Delaware, they reside here for purposes of Section 1391.[13]

A number of courts have dealt with the question whether Section 1391(c) applies to corporate plaintiffs as well as defendants. In *American Cyanamid Co. v. Hammond Lead Products, Inc.*, 495 F.2d 1183 (3d Cir. 1974), the Third Circuit held that Section 1391(c) does not apply to corporate plaintiffs. *See also Reuben H. Donnelly Corp. v. F. T. C.*, 580 F.2d 264 (7th Cir. 1978); *Data Disc Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1289 (9th Cir. 1977); *Manchester Modes, Inc. v. Schuman*, 426 F.2d 629 (2d Cir. 1970); *Carter-Beveridge Drilling Co. v. Hughes*, 323 F.2d 417 (5th Cir. 1963); *Robert E. Lee & Co. v. Veatch*, 301 F.2d 434 (4th Cir. 1961), *cert. denied*, 371 U.S. 813, 83 S.Ct. 23, 9 L.Ed.2d 55 (1962); *Phillips Petroleum Co. v. FEA*, 435 F.Supp. 1234 (D.Del.1977); *American Electronic Laboratories, Inc. v. Dopp*, 334 F.Supp. 339 (D.Del.1971). Under this line of cases, it is clear "that the residence of a corporate plaintiff for purposes of § 1391(e)(4) is restricted to the place of incorporation." *Reuben H. Donnelly Corp. v. F. T. C., supra*, at 270. *See also Suttle v. Reich Bros. Construction Co.*, 333 U.S. 163, 68 S.Ct. 587, 92 L.Ed. 614 (1948).[14] It follows that Gulf and ARCO are not properly venued in Delaware.

The *Gulf* and *ARCO* actions will be dismissed without prejudice.[15]

### III. THE TRANSFER MOTIONS.

With only the *Gulf* and *ARCO* actions dismissed, it is necessary to turn to DOE's motions to transfer the *Amoco, Northern, Exxon/Sun, Mobil, Shell, Aminoil* and *CONOCO* actions to the United States District Court for the District of Columbia.

The transfer statute, 28 U.S.C. § 1404(a), provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

It is undisputed that all of these actions "might have been brought" in the District of Columbia, pursuant to 28 U.S.C. § 1391(e)(1). Accordingly, in order to determine whether a transfer is appropriate in these cases, it is necessary to determine where the balance of interests outlined in Section 1404(a) lies.

In *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971), the Third Circuit stated:

It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that that choice " . . . should not be lightly disturbed." . . . The burden is on the moving party to establish that a balancing of proper interests weigh in favor of transfer. (Citations omitted).

In these cases, I am unpersuaded that the balance of conveniences of the parties and witnesses is a substantial factor in the disposition of DOE's motions.[16] Given the

---

**13.** In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 156 n. 20, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court dismissed its writ of certiorari on this point, noting that the "question is a difficult one."

**14.** *Suttle* was decided prior to the enactment of 28 U.S.C. § 1391(c).

**15.** Gulf and ARCO have indicated that the plaintiffs in the *Amoco* and *Exxon/Sun* actions are prepared to move for leave to file amended complaints adding Gulf and ARCO as plaintiffs. They have also indicated that the plaintiffs in

the *Shell, Amoco* and *Exxon/Sun* actions have no objections to intervention in those actions by Gulf and ARCO. The dismissals of the *Gulf* and *ARCO* actions do not affect the right of any party to make whatever application is deemed appropriate.

**16.** DOE has not developed any record which shows that the balance of conveniences favors transfer. It has merely asserted that its discovery burdens would be lightened if all of the Subpart K litigation were to proceed in one forum.

proximity of Washington and Wilmington, and the fact that these cases raise issues which are purely legal, and therefore will be capable of resolution by summary judgment motions, the conveniences of the parties and witnesses do not favor litigation of these actions in either one district or the other. In my view, the question whether these actions should be transferred to the District of Columbia must be determined solely on the "interest of justice" factors.

DOE argues that the interest of justice mandates transfer of these cases because all of the Subpart K litigation should proceed in one forum, and the only forum which can entertain these actions, the enforcement actions and the Texas action [17] is the District of Columbia Court.[18] In support of its motion, DOE relies principally upon a line of cases including *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *A. O. Smith v. F. T. C.,* 417 F.Supp. 1068 (D.Del.1976); and *General Motors Corp. v. Volpe,* 321 F.Supp. 1112 (D.Del.1970), *affirmed as modified,* 457 F.2d 922 (3d Cir. 1972). In *Abbott Laboratories, supra,* 387 U.S. at 154–5, 87 S.Ct. at 1519, the Supreme Court discussed the government's fear of a "multiplicity of suits in various jurisdictions" all dealing with the same subject matter. The Court stated:

> The short answer to this contention is that the courts are well equipped to deal with such eventualities. The venue transfer provision, 28 U.S.C. § 1404(a), may be invoked by the Government to consolidate separate actions.

There can be no argument with the position that the avoidance of multiple litigation of the same, or related, issues in more than one court, and the resulting conservation of judicial resources, is a strong interest of

justice factor. *See, e. g., Pharmaceutical Manufacturers Ass'n. v. F. D. A.,* Civil Action No. 77–291 (D.Del. October 5, 1977), slip op. at 4–7. However, it does not follow that the government is automatically entitled to have any pre-enforcement review actions transferred to the forum where it has chosen to file its enforcement actions.[19]

The *A. O. Smith* and *General Motors v. Volpe* cases make it clear that in situations of this sort, the interest of justice must be determined by balancing (1) the conversation of judicial resources, and the avoidance of inconsistent adjudications, which will result from a transfer, and (2) the possibility of prejudice to the plaintiffs flowing from that transfer. After consideration of these factors, I have concluded that the circumstances here do not warrant a transfer of these seven cases to the District of Columbia Court.

As Judge Gesell observed, the District of Columbia enforcement actions will necessitate two separate proceedings.[20] First, there are a number of purely legal issues, including the first sale issue, which must be resolved. Only after the resolution of those issues will the tedious process of determining each defendant's pricing practices and calculating possible overcharges over a three-year period commence. In view of Judge Gesell's offer to stay the District of Columbia proceedings pending determination of the first sale issue by this Court and the agreement of the District of Columbia parties that they will be bound by that determination,[21] it is now clear that there will be no duplication of proceedings with respect to the first sale issue. Accordingly, any conservation of judicial resources which might result from DOE's proposed transfer would be minimal,[22] and the possi-

---

**17.** DOE's motion to transfer the Texas action to the District of Columbia has not been ruled upon yet.

**18.** The District of Columbia Court is the only .one of the three courts where Subpart K litigation is pending where all of the parties to the litigation would be properly venued.

**19.** As noted above, DOE has not instituted any enforcement proceedings against *Sun, CONOCO, Aminoil,* or the *Northern* plaintiffs.

**20.** Transcript of Oral Argument of March 30, 1979, p. 84.

**21.** Transcript of Oral Argument of March 30, 1979, p. 125.

**22.** In addition, while Judge Gesell has ruled that he has jurisdiction over the enforcement actions brought in the District of Columbia, he has also noted that the jurisdictional issue "is

bility of inconsistent adjudications emanating from the two courts is nonexistent.[23] In fact, it seems to me that under the scheme for prosecuting the enforcement actions which Judge Gesell has outlined, the most judicially efficient manner of going forward is for this Court to proceed to judgment on the first sale issue, rather than to transfer to the District of Columbia. If these actions were transferred at this point, the familiarity with the regulations which I have achieved would be wasted, and Judge Gesell would be forced to duplicate my efforts. *Cf. GTE Sylvania, Inc. v. Consumer Product Safety Commission,* 438 F.Supp. 208 (D.Del.1977).

On the other side of the equation, I believe that the possibility of prejudice to the plaintiffs from a transfer is very real. It is apparent that the prompt resolution of the first sale issue is of great importance to the plaintiffs because their day-to-day pricing decisions hinge upon the correct interpretation of the relevant Subpart K regulations. The importance to the plaintiffs of a prompt resolution of the first sale issue is evident from the history of the Subpart K litigation, as recited above. At least three of the plaintiffs, CONOCO, ARCO,[24] and Northern, have sought administrative interpretations on the first sale issue. CONOCO and Northern have been attempting to get

an authoritative interpretation for more than three years. The alacrity with which the plaintiffs first sought suspension of the November 1, 1978 amendments to Subpart K, and then filed these actions also indicates the importance to them of a speedy resolution of the issue.[25] DOE does not dispute that the plaintiffs have a strong interest in prompt judicial review. It does maintain, however, that the plaintiffs' attempts to obtain a speedy review of the first sale issue will not be prejudiced by a transfer to the District of Columbia.

While the first sale issue is raised both here and in the District of Columbia, I am convinced that a transfer of these actions to the District of Columbia would yield a slower resolution of that issue for the plaintiffs. This is so for a number of reasons. First, the threshold jurisdictional issue awaits final resolution by TECA, as discussed above. Second, there are a plethora of legal issues raised in the District of Columbia which are not present in these cases.[26] Third, as Judge Gesell observed, the proceedings before this Court are considerably more advanced than those before the District of Columbia Court. For these reasons, I am convinced that the resolution of the issues raised in these cases on their merits can be achieved most promptly if the cases remain in this forum.

not free from doubt," and has certified that issue to the Temporary Emergency Court of Appeals. If TECA should conclude that the District of Columbia Court lacks jurisdiction over the enforcement actions, any conversation of judicial resources resulting from a transfer would be eliminated.

23. While all of the issues concerning the pricing of NGLs and NGLPs are related, and a knowledge of the entire regulatory scheme would be helpful to the resolution of any specific issue, as far as the Texas action is concerned, I perceive little, if any, overlap between these actions and the Texas action, and consider it unlikely that there will be any problem of inconsistent results between this Court and the Texas Court.

24. While the *ARCO* action has been dismissed for want of venue, and ARCO is out of this Court at least temporarily, its attempt to get a

ruling on the first sale issue seems to me to be relevant as an indicator of the importance to the plaintiffs of a prompt resolution of that issue.

25. Such an attitude on the part of the plaintiffs is not surprising. Each day that a plaintiff does not comply with the Mandatory Petroleum Pricing Regulations, it risks civil penalties of $20,000 and criminal penalties of $40,000. *See* 15 U.S.C. § 754(a)(3) and 10 C.F.R. § 205.-203.

26. In addition, as noted above, there are issues other than the first sale issue raised in the *Northern* and *Aminoil* cases which are not raised in the District of Columbia actions. There is no reason why the *Northern* and *Aminoil* plaintiffs should have those discrete issues bogged down in the District of Columbia actions.

DOE's motions to transfer will be denied.[27]

27. Initially, DOE had moved to transfer or stay the *Northern, Aminoil* and *CONOCO* actions. At oral argument, counsel for the plaintiffs indicated that DOE was no longer pressing its motions to stay those cases. However, DOE's counsel did not take a position on the record.

It is obvious, in light of the interests of the plaintiffs in prompt resolution of the issues raised, and in light of Judge Gesell's grant of a stay of his actions pending resolution of the issues before this Court, that the motions to stay those cases must be denied.