E. I. DUPONT de NEMOURS AND
COMPANY, Plaintiff,

v.

DIAMOND SHAMROCK
CORPORATION,
Defendant.

Civ. A. No. 80–137.

United States District Court,
D. Delaware.

Sept. 16, 1981.

Richard D. Allen, Morris, Nichols, Arsht
& Tunnell, Wilmington, Del., John O. Tra-
montine, David J. Lee, Fish & Neave, New
York City, for plaintiff.

C. Waggaman Berl, Jr., Wilmington, Del.,
John D. Foley, William S. Feiler, Israel
Blum, Joseph A. Calvaruso, Morgan, Finne-
gan, Pine, Foley & Lee, New York City, for
defendant.

## OPINION

STAPLETON, District Judge:

DuPont filed this action in the District of
Delaware on March 27, 1980, seeking a dec-
laration of the invalidity of United States
Patent No. 4,192,725, issued to Ronald Dot-
son and Kevin J. O'Leary and assigned to
Diamond Shamrock ("the Dotson '725 pat-
ent"). The Dotson '725 patent claims a
process for producing chlorine and sodium
hydroxide (lime) by the electrolysis of a
solution of water and ordinary salt (sodium

chloride). The Dotson process involves the use of a membrane which transmits positively charged ions (cations) which collect in one chamber of the chloralkali cell to form hydrogen gas and sodium hydroxide leaving purified chlorine gas in the other. Two other actions, one in the Western District of New York and the other in the Eastern District of Oklahoma, also concerned the validity and infringement of Diamond's "membrane patents." Now before the Court are DuPont's motion for a preliminary injunction to restrain Diamond from proceeding against DuPont in the New York action, and Diamond's motion for a stay or transfer of this case. Since both parties agree that transfer of this matter to the Western District of New York is preferable to a stay, I will consider only the motion to transfer.

## I. THE FACTS

### A. *The Diamond Patents*

DuPont developed what it now markets as Nafion [R] membranes in the early 1960's. To develop additional commercial uses, DuPont provided samples of the membrane to various chemical companies, including Diamond. Diamond is a major chloralkali producer, and its engineers and scientists discovered that Nafion membrane could be used to separate the two halves of a chloralkali cell which produced chlorine and sodium hydroxide by electrolysis.[1] Diamond obtained three patents on the membrane production method, the Dotson et al '725 patent, the Dotson '163 patent, and the Dotson et al '405 patent. One of the chief advantages of the Diamond process is that it does away with the use of mercury in chloralkali cells, eliminating a highly toxic pollutant.

DuPont supplied the Nafion membrane to Diamond under a Membrane Licensing Agreement, which DuPont now asserts, gives it and its customers a license under Diamond's patents. Hooker Chemical Company, the plaintiff in the New York action, purchases Nafion from DuPont for use in chloralkali electrolytic cells, and competes with Diamond in the production of alkali metal hydroxides.

### B. *The Litigation*

Hooker filed an amended complaint for a declaratory judgment of the invalidity of six Diamond Shamrock patents in December 1979. In addition to the '405 and '163 patents, Hooker also attacked the validity of four patents relating to another chloralkali production method using water-permeable diaphragms rather than a membrane as the separator.

The '725 patent issued on March 11, 1980. On the same day Diamond instituted suit against Hooker and one of Hooker's customers for imminent infringement of the newly minted patent. This suit for a declaratory judgment followed on March 27. Diamond counterclaimed for infringement of the '725 and '163 patents. Four days later Hooker amended its New York complaint to include the '725 patent, and moved to enjoin Diamond from prosecuting the Oklahoma action.

On April 3, 1980 Diamond added DuPont as a defendant in Oklahoma, and amended the complaint to include the '163 and '405 patents. Diamond subsequently sought to enjoin DuPont from proceeding in this case, and moved the New York court to sever and to transfer litigation of the membrane patent issues to Oklahoma. The United States District Court for the Western District of New York enjoined Diamond from going forward in Oklahoma on June 23, 1980, and denied its motion to transfer and sever.[2]

On July 31, 1980 Diamond filed an answer and counterclaim, demanding a jury trial, and adding a claim for the infringement of an additional patent unrelated to the membrane process (the " '257 patent"). In September 1980 Diamond moved to add

---

1. The patent in fact claims a process for producing a halogen gas and an alkali metal hydroxide. Apparently lime and chlorine are the major commercial applications of this process.

2. *Hooker Chemicals v. Diamond Shamrock Corp.*, 87 F.R.D. 398 (W.D.N.Y.1980).

DuPont as an involuntary plaintiff in New York. The New York Court denied that motion on August 18, 1981, but ordered DuPont joined under Rule 19(a), and aligned with Hooker as a party plaintiff.

## II. THE LAW

### A. *Preliminary Injunction*

■ DuPont insists that this Court must enjoin Diamond from proceeding against it in New York by straightforward application of the "first filed" rule. *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925 (3d Cir. 1941), *cert. denied*, 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211 (1942). Hazeltine Corporation notified Crosley that it had infringed twenty-two Hazeltine patents. Thereupon Hazeltine instituted suit in Ohio alleging the infringement of two of the twenty-two patents asserted in the notice. Crosley then filed suit in the District of Delaware claiming that the remaining twenty patents were invalid and not infringed. Hazeltine then filed nine new law suits in Ohio claiming infringement of fifteen of the patents involved in the Delaware suit. Crosley moved to enjoin the nine later Ohio suits; the district court refused. After reviewing British precedent, the Third Circuit held that the district court, once acquiring jurisdiction over a controversy, had intrinsic power to enjoin a litigant from proceeding in another forum. The Court of Appeals reversed the District Court, finding an abuse of discretion in its refusal to enjoin Hazeltine's Ohio lawsuits:

> The party who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual system permits, be free from the vexation of subsequent litigation over the same subject matter. The economic waste involved in duplicative litigation is obvious. Equally important is its adverse effect on the prompt and efficient administration of justice.

122 F.2d at 930. DuPont's reasoning is beguilingly simple. This Court acquired jurisdiction over the validity of the '725 patent before the New York court; accordingly it has prior jurisdiction over the "con-troversy," and must enjoin. But the Third Circuit's analysis in *Kerotest Mfg. Co. v. C–O Two Fire Equpt. Co.*, 189 F.2d 31 (3d Cir. 1951), *aff'd*, 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952) repudiates this easy syllogism.

The *Kerotest* litigation began when C–O Two sued Acme, a customer of Kerotest, for patent infringement in the Northern District of Illinois. Kerotest filed its own declaratory judgment action against C–O Two in the District of Delaware two months later. Then C–O Two sought to join Kerotest as a party to the Chicago litigation. The Chicago court joined Kerotest as a defendant. Kerotest then moved for an injunction in the District of Delaware, to prevent C–O Two from going forward against Kerotest in Chicago. The District Court issued an injunction and the Third Circuit reversed.

The Court of Appeals agreed that the first action between C–O Two and Kerotest was filed in Delaware, but added "[n]either Crosley nor Westinghouse was intended to lay down a rule of thumb. The rule as we conceived it was designed as an aid to the parties and to effect the ends of justice." *Id.* 189 F.2d at 34. The Court emphasized:

> In the instant case the whole of the war and all the parties to it are in the Chicago theatre and there only can it be fought to the finish as the litigations are now cast. On the other hand if the battle is waged in the Delaware arena there is a strong probability that the Chicago suit nonetheless would have to be proceeded with for Acme is not and cannot be made a party to the Delaware litigation. . . . Why, under the circumstances, should there be two litigations where one will suffice?

*Id.* I agree with DuPont that this Court has the authority, under *Crosley*, to enjoin Diamond from prosecuting its counterclaim against DuPont in New York. I decline to do so because I find that litigation of all of the issues arising under Diamond's membrane patents in one place, before one court, will better serve the ends of efficient litigation and substantive justice.

Diamond's counterclaim against DuPont rests on a theory of contributory infringement. To prove its case, therefore, Diamond must establish actual infringement. Diamond represents that Hooker is the only DuPont customer currently using Nafion membrane to infringe the various Diamond patents. Litigation of Diamond's counterclaim, here or in Buffalo, necessarily entails proof of Hooker's activities.

In addition, the New York court must address the complexities of membrane cell technology even if this Court were to grant DuPont's injunction. Hooker intends to litigate the validity of the '405 and '163 patents—questions over which the New York court first obtained jurisdiction—as well as the '725 patent. Although Diamond asserts that the '405 and '725 patents are "quite distinct" as a matter of patent law, DuPont's reliance on this statement is unpersuasive. Diamond prosecuted the '405 patent as a continuation of the '725 patent application. Both patents are "part and parcel" of the same basic controversy. *See Cosden Oil & Chem. Co. v. Foster Grant Co.*, 432 F.Supp. 956, 960 (D.Del.1977).

Neither *Crosley* nor *Kerotest* directly controls this case. But in my view the fundamental objectives of speedy, fair, and efficient litigation would not be served by preventing the New York court from bringing this multi-patent, multi-party controversy to a conclusion. DuPont also argues that *Kerotest* antedated the Supreme Court's decision in *Blonder-Tongue v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), which abandoned the mutuality of estoppel requirement for patent infringement cases. Under *Blonder-Tongue*, if this Court finds the '725 patent invalid against Diamond, Diamond is estopped from asserting its validity against Hooker in New York. This is true, but not compelling. If this Court upholds the Diamond patent, that decision will have no effect on Hooker's right to challenge these same patents, except as a matter of judicial deference. Logic dictates that a single court decide once on all three related patents.

DuPont also argues that the ruling in *Kerotest* depended upon the assurance of a prompt disposition of the case in Chicago. Citing recent caseload statistics, DuPont urges that this matter will reach trial far more quickly in Delaware than in New York. I am not convinced. Diamond previously sought a severance of the membrane patents from the diaphragm patents in New York, and has indicated that it is willing to waive its jury demand as to the membrane patents. Although the '405 patent is present in New York and is not involved here, I consider it unlikely that trial in New York would be substantially longer or more complex than trial here. Differences in caseload are difficult to capture statistically, and I consider it entirely speculative that this Court would be able to try this case before the New York court. In any event, I see no reason to believe that the delay, if any, would jeopardize the substantive rights of either party.

### B. *The Motion To Transfer*

Under 28 U.S.C. § 1404(a) "[f]or the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." DuPont might have filed this action for declaratory judgment against Diamond in the Western District of New York, and it is therefore subject to transfer. Although I am mindful of the rule that "a plaintiff's choice of a proper forum is a paramount consideration" *Shutte v. Armco Steel Corporation*, 431 F.2d 22, 25 (3d Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971) I find compelling reasons not to apply that rule in this case.

The plaintiff's choice of forum carries greater weight when it will not result in duplicative litigation than it does here, where the United States District Court for the Western District of New York will hear testimony concerning the validity and infringement of the very patents here in suit. DuPont filed this action after Hooker filed its complaint in New York, and after Diamond initiated proceedings in Oklahoma. It plainly chose its own convenience in pref-

erence to entering into two lawsuits already pending in federal court. As the Supreme Court wrote, in *Van Dusen v. Barrack*, 376 U.S. 612, 624, 84 S.Ct. 805, 813, 11 L.Ed.2d 945 (1964), "[t]he power to defeat a transfer to the convenient federal forum should derive from the rights and privileges conferred by federal law and not from the deliberate conduct of a party favoring trial in an inconvenient forum."

The preference for honoring a plaintiff's choice of forum is simply that, a preference; it is not a right. If this Court were to honor DuPont's preference it would needlessly engage two courts in the simultaneous management of discovery and the trial of the very same issues. Hooker's allegedly infringing conduct is likely to be an issue in Delaware, as it will be in New York, because Diamond must prove Hooker's infringement to establish its theory of contributory infringement by DuPont. The New York court will have to decide if the '163 patent is valid, as well as deciding the validity of the '405 patent which is related to the '725 patent before this Court.

Although DuPont stresses that Wilmington is more convenient for its witnesses than is Buffalo, on balance I find Buffalo to be at least as convenient for "the parties and witnesses" to this case. Buffalo is significantly closer to Diamond's headquarters and research center in Ohio than is Wilmington, Hooker's employees are most accessible in Buffalo, and their testimony is likely to be required in any forum. These advantages counterbalance the disadvantage to DuPont in having to transport its counsel and witnesses to Buffalo.

DuPont's strongest argument in opposition to transfer is alignment with Hooker. DuPont posits two grounds of prejudice. First, the New York litigation includes nine

patents in all, six of which are not related to membrane cell technology. In a jury trial, DuPont fears, the weaknesses of Hooker's position with respect to the other patents in suit may "rub off" onto the jury's assessment of the membrane patents. Second, the jury may be prejudiced against Hooker, and anyone on Hooker's side, because of Hooker's involvement in the notorious Love Canal chemical dump.

The New York court is in a far better position both to assess and to cure this possible prejudice. As earlier noted, Diamond agreed, at oral argument, to waive its jury demand with respect to the membrane patents. If the New York court, which is better able to observe potential prejudice to DuPont than am I at a distance of several hundred miles, finds that a single jury trial holds significant potential of prejudice to DuPont, it has all of the power it needs to bifurcate the trial and to hold a non-jury trial on the membrane cell patents.

In this case, the overriding fact is that it is manifestly inconvenient for the parties and for witnesses to attend trials in both New York and Delaware. It is also a waste of judicial resources. DuPont's objections are insubstantial in comparison.[3] One additional factor to be considered, although its weight is hard to assess, is the advantage to the parties and to the Court in unified discovery regarding both the diaphragm and membrane production methods. Under all of the circumstances, I find transfer to the Western District of New York appropriate.

### III. CONCLUSION

For the reasons stated, I will order this action transferred to the Western District of New York. Plaintiff's motion for a preliminary injunction is denied.

---

**3.** This certainly does not mean that I adopt a *per se* rule requiring transfer of any "duplicative" case. In *Amoco Production Co. v. United States*, 469 F.Supp. 236, 243–46 (D.Del.1979) this Court denied transfer of a multi-party energy case to the District of Columbia, although there was another case already pending. The District of Columbia Court had agreed to stay proceedings pending the outcome of the Delaware litigation, eliminating the danger of dupli-

cation. The court also found a likelihood of prejudice from delay because day-to-day pricing decisions hinged on the interpretation of the regulations involved in that case. Here, the possibility of delay in Buffalo is quite speculative, and there has been no showing of prejudice likely to flow from a delay, if any. Nor are these proceedings "considerably more advanced" than those in the Buffalo action.