**PENNZOIL COMPANY, Plaintiff,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary, Department of Energy, Defendants.**

Civ. A. No. 78–335.

United States District Court, D. Delaware.

Nov. 2, 1979.

William O. LaMotte, III, and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John P. Mathis and Randolph Q. McManus of Baker & Botts, Washington, D.C., James W. Shaddix and Jay G. Martin, Pennzoil Co., Houston, Tex., for plaintiff.

James W. Garvin, Jr., U.S. Atty., John H. McDonald, Asst. U.S. Atty., Wilmington, Del., Larry P. Ellsworth, Richard H. Levi, and Barbara J. Erickson, Dept. of Energy, George Kielman and Dean S. Cooper, Dept. of Energy, Washington, D.C., for defendants.

OPINION

STAPLETON, District Judge:

I.  INTRODUCTION.

Plaintiff Pennzoil Company ("Pennzoil") brought this action against the Department of Energy and the Secretary of Energy (collectively, "DOE")[1] to obtain a judicial determination of the validity of DOE Ruling 1975–15.  40 Fed.Reg. 40832 (Sept. 4, 1975).  Now before me are the DOE's motion to join the United States as a party defendant and Pennzoil's motion to toll or stay penalties *pendente lite* for failure to comply with the DOE's Mandatory Petroleum Price Regulations ("MPPR"), 10 C.F.R. Part 212 (1978).

The factual background of this case has already been set out in full.[2]  It need only be noted here that domestic crude oil production is subject to a two-tiered system of federal price control regulation; that "old oil" is subject to a lower ceiling price than "new oil"; that whether oil is "old" or "new" is determined by reference to historical and current levels of production on a "property", as that term is defined in the MPPR, 10 C.F.R. § 212.75; that a unit agreement is an agreement among holders of property interests in oil producing properties to consolidate their operations in order to enhance aggregate production; that in Ruling 1975–15 the DOE attempted to interpret and apply its regulatory definition of "property" to owners of oil producing interests subject to unit agreements, and that Pennzoil Producing Company, a wholly owned subsidiary of Pennzoil, is the operator and an interest owner in the Walker Creek Unit, a domestic oil producing operation which was unitized on May 1, 1974.

II.  JOINDER.

■  The DOE alleges that Pennzoil has failed to comply with Ruling 1975–15 and that its pricing policies are, therefore, in violation of the MPPR.  Under the applicable enforcement statute the DOE itself lacks authority to bring suit to enforce the

1.  In this Opinion "DOE" will also refer to the Department of Energy's predecessor agencies, including the Federal Energy Administration, Federal Energy Office, and Cost of Living Council, as well as to the United States in

discussions of its proposed counterclaims against Pennzoil.

2.  *See Pennzoil v. DOE*, 466 F.Supp. 238, 239–241 (D.Del.1979).

regulations.[3] Accordingly, the DOE seeks to join the United States for the purpose of asserting an enforcement counterclaim.

Pennzoil opposes joinder of the United States as a counterclaiming party defendant. First, it asserts, joinder of the United States in this case is not permitted by the Federal Rules of Civil Procedure. Second, it contends that this Court lacks subject matter jurisdiction of the counterclaim. Third, it argues that the United States is barred from asserting its counterclaim in federal court by the doctrine of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), which requires an administrative agency to comply with its own regulations and practices, because the DOE has failed to observe its administrative enforcement regulations. Should I decide against it on these arguments, Pennzoil urges that I phase litigation of the counterclaim so that the issues raised in its complaint may be adjudicated before any action is taken with respect to the counterclaim.

Considering first the procedural propriety of joining the United States as a party defendant, I find nothing in the Federal Rules of Civil Procedure to prevent joinder. Fed.R.Civ.P. 19(a)[4] requires joinder of an entity which is subject to service of process and can be joined without stripping the Court of subject matter jurisdiction if the entity is interested in the subject matter of the lawsuit and may be affected by its disposition in its absence. Joinder of the United States as a defendant in this action satisfies these requirements. The United States has a clear interest in enforcing the DOE's MPPR. Its ability to protect that interest may be impaired or impeded by the disposition of this action if, for example, I find that Ruling 1975–15 is invalid or that it may not be applied retroactively. Inasmuch as the United States is subject to service of process and its joinder will not deprive the Court of subject matter jurisdiction over this action, the Federal Rules require it to be joined as a defendant in this action.

Whether the United States may properly assert a counterclaim against Pennzoil presents a different question. Again the Federal Rules of Civil Procedure appear to require assertion of the counterclaim. Fed. R.Civ.P. 13(a)[5] requires a party to assert as a counterclaim any claim against an opposing party which arises out of the same transaction or occurrence as the opposing party's claim and whose adjudication does not necessitate the presence of third parties over whom the court lacks jurisdiction.

---

3. Section 209 of the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note (1979 Supp.), *as incorporated by* Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 754(a)(1) (1976), provides as follows:

> Whenever it appears to any person authorized by the President to exercise authority under this title that any individual or organization has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any order or regulation under this title, such person may request the Attorney General to bring an action in the appropriate district court of the United States to enjoin such acts or practices, and upon a proper showing a temporary restraining order or a preliminary or permanent injunction shall be granted without bond. Any such court may also issue mandatory injunctions commanding any person to comply with any such order or regulation. In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation.

4. Fed.R.Civ.P. 19(a) provides, in pertinent part, as follows:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest . . . .

5. Fed.R.Civ.P. 13(a) provides, in pertinent part, as follows:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

The Third Circuit Court of Appeals has stated that a counterclaim is mandatory if it bears a "logical relationship" to the opposing party's claim. *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961). Claims bear a "logical relationship" to each other if "they are offshoots of the same basic controversy between the parties." *Id.* Such is the case here. Pennzoil's claim and the claim the United States hopes to assert as a counterclaim both derive from a basic controversy which concerns the validity and interpretation of DOE Ruling 1975–15. Pennzoil claims that Ruling 1975–15 is invalid and seeks a judicial declaration to that effect. The United States asserts that the Ruling is a valid interpretation of the MPPR and seeks enforcement. As a result of this logical relationship, once the United States becomes a party, the Federal Rules require it to assert its counterclaim for enforcement of its regulations in this action unless it is otherwise barred from suing in federal court at this time.

■ Pennzoil argues that the United States is barred from doing so by Section 209 of the ESA.[6] By amending the ESA in 1971, Pennzoil contends, Congress intended to require the DOE to undertake administrative enforcement proceedings before bringing suit in federal court. Pennzoil purports to find support for this argument in the legislative history of the 1971 amendments to the ESA, the decision of a federal district court, the opinion of an assistant United States attorney general, agency regulations, and Section 503 of the Department of Energy Organization Act ("DOEA"), 42 U.S.C. § 7101, *et seq.* (1978). The DOE

relies on the plain meaning of Section 209 and on the legislative history of that section for the proposition that it may sue to enforce its regulations in federal court without first going through its administrative enforcement procedures.

The argument that Section 209 requires the DOE to exhaust its administrative procedures has previously been made before three other federal judges and rejected by each. *United States v. Exxon Corp.*, 470 F.Supp. 674 (D.D.C.1979); *United States v. Exxon Corp.*, Civ. Action No. 78–2078 (D.D.C. April 10, 1979); *Evanson v. Union Oil Co. of California*, No. 4–75 Civ. 671 (D.Minn. March 22, 1978). The specific contentions asserted by Pennzoil here were addressed most thoroughly by Judge Flannery in *United States v. Exxon Corp., supra*, 470 F.Supp. 674. He considered fully the legislative history of the 1971 amendments to the ESA[7] and found no evidence for the proposition that Congress sought to require the DOE to proceed administratively to enforce its regulations before bringing suit in federal court. *Id.* at 678. Judge Flannery also considered the legislative history underlying enactment of the EPAA, 15 U.S.C. § 751, *et seq.* (1976 & 1979 Supp.), in which Section 209 of the ESA was incorporated by reference, 15 U.S.C. § 754(a)(1), and concluded that Congress did not intend thereby to interfere with the ability of any agency authorized to act under the ESA to choose whether to enforce its regulations and orders in federal court or through its administrative procedures. *Id.* at 679–680. Judge Flannery also considered whether Section 503 of the DOEA, 42 U.S.C. § 7193 (1978),[8]

---

6. *See* note 3, *supra*.

7. Congress amended the Economic Stabilization Act in 1971 by, *inter alia*, modifying present Section 209 (former Section 205) so as to require persons authorized to exercise authority under the Act who believe that any order or regulation under the Act is being violated to request the Attorney General to sue for enforcement in federal court. Amended Section 209 also contains language clarifying the power of the court to order restitution of moneys received in violation of any such order or regulation. Congress also added Section 207, specifying the administrative procedures to be

employed by agencies authorized to issue rules, regulations or orders under the Act. *Compare* Public Law 92–210, 85 Stat. 743 (1971), *with* Public Law 91–379, Title II, 84 Stat. 796, 799 (1970).

Pennzoil concedes that prior to the 1971 amendments agencies exercising authority under the ESA were not required to exhaust administrative procedures before suing for enforcement in federal court.

8. Section 503 of the DOEA states, in pertinent part:

(a) If upon investigation the Secretary or his authorized representative believes that a

revoked the DOE's dual-enforcement authority and concluded that it did not. *Id.* at 680–683.

I am convinced by the express terms of Section 209 that the DOE is empowered to enforce its regulations by bringing suit in federal court without exhausting its administrative procedures. If those terms are not to be given effect because they have been implicitly "repealed" in legislative history or by the provisions of another statute, the evidence for such repeal must be clear and convincing. *United States v. Exxon Corp., supra,* Civ. Action No. 78–2078. I agree with Judge Flannery, however, that the legislative history and statutory language of the ESA, EPAA and DOEA, while specifying what procedures must be followed *if the DOE chooses to enforce its price control regulations administratively,* do not prohibit it from suing for enforcement in federal court instead.

Nor is my conclusion affected by the regulations cited by Pennzoil to "confirm the limitations on the agency's right to bring suit under Section 209." None supports Pennzoil's contention that the DOE is precluded from enforcing its regulations in federal court before exhausting its administrative procedures. "Procedural Rules Relating to Economic Stabilization Matters", 6 C.F.R. Part 401, 37 Fed.Reg. 1010 (Jan. 21, 1972), since rescinded, did not mandate use of administrative enforcement procedures in all instances, but permitted an agency to circumvent those procedures if it had "compelling reasons" for doing so. 6 C.F.R. § 401.502(b) (1972). Pennzoil also relies on 10 C.F.R. Part 205, 39 Fed.Reg. 32262 (Sept. 5, 1974). As Pennzoil points out, in proposing those regulations the DOE stated that specified administrative procedures would be used in all enforcement "proceedings".

39 Fed.Reg. 25602, 25605 (July 11, 1974). Pennzoil fails to state that "proceedings" was defined elsewhere in the regulations to include only those enforcement actions which were undertaken administratively by the DOE, 10 C.F.R. § 205.2, 39 Fed.Reg. 32262, 32264, *supra,* and that elsewhere in Part 205 the DOE reaffirmed its right to request that the Attorney General bring an enforcement action "[w]henever it appears" that any regulation or order is being violated. 10 C.F.R. § 205.203, 39 Fed.Reg. 32262, 32280, *supra.* Pennzoil's reliance on DOE's Enforcement Manual is equally misplaced. The section referred to concerns procedures for referring cases to the Justice Department for civil or criminal penalties, rather than for an adjudication of a violation, which is discussed in another section.

Pennzoil's position is also not strengthened by the District Court case and the Assistant Attorney General's letter which it cites. The case, *United States v. Shapiro Food Products, Inc.,* No. 72–80 H Civ. (D.Md.1972), held that the Internal Revenue Service was prohibited by its *regulations,* 6 C.F.R. § 401.502, 37 Fed.Reg. 1010, 1014–15, *supra,* from filing an enforcement action under Section 209 without following the investigative procedures set forth in those regulations. As I have already noted, those regulations have since been rescinded. Since the court in *Shapiro* did not discuss whether an agency is *statutorily* authorized to sue for enforcement of its regulations directly in federal court, that decision provides no guidance as to whether the DOE may do so in this case. Inasmuch as the opinions expressed in the letter of Assistant Attorney General Harlington Wood cited by Pennzoil are based explicitly on *Shapiro,* it too is of no help in deciding whether this Court has subject matter jurisdiction of the .

person has violated any regulation, rule, or order . . . promulgated pursuant to the Emergency Petroleum Allocation Act of 1973, he may issue a remedial order to the person.

\* \* \* \* \* \*

(c) If within thirty days after the receipt of the remedial order issued by the Secretary, the person notifies the Secretary that he intends to contest a remedial order issued under subsection (a) of this section, the Secretary shall immediately advise the [Federal Energy Regulatory] Commission of such notification . . . The Commission shall, upon request, afford an opportunity for a hearing . . . The Commission shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's remedial order, or directing other appropriate relief.

United States's counterclaim against Pennzoil.

On the basis of the clear language of Section 209, the lack of clear and convincing evidence of its implicit repeal, and the failure of Pennzoil to provide any other reason to justify disregarding that language, I conclude that this Court does possess subject matter jurisdiction of the United States's counterclaim, despite the DOE's failure to exhaust its administrative procedures.

Pennzoil contends, nonetheless, that the counterclaim of the United States must be dismissed because "the government has proceeded here without first complying with the procedural requirements of the DOE's administrative enforcement regulations and with the policy regarding treatment of unitized properties as set forth in Ruling 1977–2." In so acting, Pennzoil claims, the DOE has violated the doctrine established in *United States ex rel. Accardi v. Shaughnessy, supra,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, and its progeny.[9] Under the *Accardi* doctrine, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974).

In both *United States v. Exxon, supra,* 470 F.Supp. 674, and *United States v. Exxon, supra,* Civ. Action No. 78–2078, the DOE sued directly in federal court under Section 209 to enforce its regulations. In both cases the defendants relied on the *Accardi* doctrine as grounds for dismissal. In each case the argument was rejected. In the latter, Judge Gesell stated that the DOE's suit "is not inconsistent with the past actions of the agency." *Ibid.* In the former, Judge Flannery found the defendant's reliance on the *Accardi* doctrine to be "mis-

placed." *United States v. Exxon, supra,* 470 F.Supp. at 684. Pennzoil here asserted that Judge Flannery erred in interpreting the doctrine to be limited to cases involving an "explicit agency regulation" and "detrimental reliance" thereon. It insists that, if given the more expansive interpretation for which it argues, the doctrine would necessitate dismissal of the counterclaim the United States seeks to assert here. I find it unnecessary to address the breadth of the *Accardi* doctrine because I conclude that even if Pennzoil is correct as to its breadth, the DOE does not violate the doctrine by suing to enforce its regulations in federal court without first exhausting its administrative procedures.

■ I reach this conclusion, first, because Pennzoil is clearly in error in claiming that the DOE somehow violates its administrative enforcement regulations by suing directly in federal court. The regulations currently in effect state the following: "Nothing in these regulations is intended to affect the authority of DOE enforcement officials in coordination with the Department of Justice to initiate appropriate civil or criminal enforcement actions *at any time.*" 10 C.F.R. § 205.190(a), 44 Fed.Reg. 7922, 7925 (Feb. 7, 1979) (emphasis added). Admittedly, this provision was added to the DOE's regulations only recently.[10] However, the *Accardi* doctrine does not bar an agency from amending its regulations, *see United States v. Nixon, supra,* 418 U.S. at 694–696, 94 S.Ct. 3090, as long as the amendment process is procedurally adequate and the amended regulation is consistent with the authorizing statute. Both requirements are satisfied by amended Section 205.190(a).[11] Whatever the DOE's

---

9. *See, e. g., United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

10. 43 Fed.Reg. 3995, 3997 (Jan. 31, 1978) (interim regulations), 44 Fed.Reg. 7922, 7925 (Feb. 7, 1979) (final regulations).

11. In promulgating the interim regulations on January 31, 1978, the DOE did not provide

notice and an opportunity for comment. However, the final regulations, promulgated on February 7, 1979, are applicable to the counterclaim which the United States seeks to assert here. Those regulations were adopted only after notice and an opportunity for comment had been provided. *Id.* at 7922.

That 10 C.F.R. § 205.190(a), *as amended,* is consistent with Section 209 of the ESA is apparent upon comparison of the language of the statute and the regulation. *See* note 3, *supra.*

practice may have been prior to the amendment of Section 205.190(a), therefore, is also irrelevant because the *Accardi* doctrine does not prohibit all changes in agency practice and procedure, but only such as are arbitrary and unexplained.

Nothing in DOE Ruling 1977–2, 42 Fed. Reg. 4409 (Jan. 25, 1977), leads me to a contrary conclusion. That ruling states that the DOE will "on a case-by-case basis, permit [operators of units formed before February 1, 1976] to justify the establishment of the date of significant alteration in producing patterns in such units on reasonable bases other than those specified in the present definition." *Id.* at 4415.[12] Pennzoil argues that by suing directly in federal court to enforce the regulation in which the present definition appears,[13] the DOE has "contravened" its case-by-case approach. Judge Flannery correctly disposed of the same contention in *United States v. Exxon, supra,* 470 F.Supp. 674. He stated, "the fatal flaw in this argument is in its assumption that Exxon [here Pennzoil] will be barred or precluded from attempting to establish an alternate date in the proceedings before the court." *Id.* at 685. As in that case, nothing in the record here suggests that the DOE seeks to prevent Pennzoil from attempting to support such a date in defense to the DOE's enforcement counterclaim. As Judge Flannery observed, *id.*, the sole consequence of the DOE's decision to enforce its regulations in a judicial rather than an administrative proceeding is that "this court, rather than an arm of the agency, will assume the task of making findings of fact and conclusions of law" with respect to the date advanced by Pennzoil. This hardly amounts to a repudiation of the policy announced in Ruling 1977–2.

Having found that this Court has subject matter jurisdiction of the counterclaim, that the counterclaim is procedurally proper and that in asserting it the DOE has not violated the *Accardi* doctrine, I conclude that the United States may be joined in this action as a counterclaiming party defendant.[14]

■ Despite this conclusion, I agree with Pennzoil that adjudication of the counterclaim should be deferred until I have ruled on the legal issues raised by Pennzoil's complaint. Pennzoil's declaratory judgment action attacks the validity of DOE Ruling 1975–15. The DOE's counterclaim seeks to enforce its MPPR as interpreted by Ruling 1975–15. As I stated in rejecting the DOE's arguments that Pennzoil's claims were not ripe for adjudication and that Pennzoil was required to exhaust the DOE's administrative procedures before challenging Ruling 1975–15 in federal court, it would be "futile . . . to expend . . . time and resources applying the Ruling to the specific factual situation of Walker Creek" until the validity of the Ruling is determined. *Pennzoil v. DOE, supra,* 466 F.Supp. at 244. Should I sustain Pennzoil's claim, it may be unnecessary and a waste of resources to consider the enforcement counterclaim. Moreover, since Pennzoil's "day-to-day pricing decisions will be substantially affected by the resolution" of its legal claims, *id.* at 242, justice and common sense call for the expeditious resolution of those claims. That objective would be frustrated by the simultaneous adjudication of the DOE counterclaim, resolution of which will require a substantial and time-consuming factual inquiry. Accordingly, trial of the claim and counterclaim will be bifurcated and discovery with respect to the latter will be stayed pending adjudication of the former.

12. As appears more fully below, operators of units formed prior to February 1, 1976 may establish a "unit base production control level" ("BPCL") as of the date of unitization or as of the date of a significant alteration in producing patterns. In simplified terms, monthly production below a unit's BPCL is considered "old" oil, while monthly production which exceeds the BPCL is "new" oil.

13. 10 C.F.R. § 212.75 (1978).

14. Nothing in the record supports Pennzoil's contention that the DOE has acted in an arbitrary, discriminatory or retaliatory manner in asserting a counterclaim not based on prior administrative enforcement orders. Accordingly, I decline to dismiss the counterclaim on that basis, as well.

## III. PENALTIES.

Under Section 5(a)(3) of the EPAA, 15 U.S.C. § 754(a)(3),[15] and regulations promulgated thereunder[16] civil penalties of up to $20,000 may be imposed for each violation of the MPPR. In the instant case the DOE has indicated that it intends to seek civil penalties for what it views as the non-compliance of the Walker Creek Unit with its regulatory definition of property, as applied to unitized operations by Ruling 1975-15, resulting in Pennzoil's use of what the DOE regards as an invalid BPCL for computing quantities of "old" and "new" oil. Characterizing the DOE's declared intention to seek penalties under Section 5(a)(3) as an attempt to intimidate it from maintaining its challenge to Ruling 1975-15, Pennzoil has moved the Court to toll or stay penalties which would otherwise accrue during the pendency of this action.

At the time the Walker Creek Unit was formed in May of 1974, DOE regulations defined "property" as "the right which arises from a lease or from a fee interest to produce domestic crude oil." 10 C.F.R. § 212.72 (1975). On August 29, 1975, the DOE promulgated Ruling 1975-15, purporting to apply the regulatory definition of property to domestic crude oil producing operations unitized since 1972. 40 Fed.Reg. 40832 (Sept. 4, 1975). The Ruling de-emphasized the "lease or . . . fee interest" component of the property definition, stating instead that the property concept focuses upon the "right to produce crude oil." *Ibid.* For unitized properties the right to produce was deemed to be centered in the unit as a whole, rather than its constituent leases. Thus, according to the Ruling, the BPCL[17] of a unitized property was to be calculated by reference to the total monthly production of the unit in 1972, for units formed before that year, and by reference to the total monthly production of the constituent leases in 1972, for units formed thereafter. The Ruling, moreover, seemed to require a unit BPCL to be employed as of the date of unitization, even if that date had occurred prior to the promulgation of the Ruling.

Although the Walker Creek Unit was formed in May of 1974, it did not adopt a unit BPCL until September 1, 1975. Thus, if Ruling 1975-15 is a valid interpretation of the property definition contained in 10 C.F.R. § 212.72, the unit has been and continues to be in violation of the MPPR and subject to the penalties described above. Accordingly, Pennzoil seeks a stay of penalties *pendente lite.*

■ I have previously held that Section 211(d)(2) of the ESA, 12 U.S.C. § 1904 note, incorporated by reference in Section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1),[18] affords the sole means by which a party may obtain *pendente lite* relief in cases under the EPAA. *Amoco Production Co. v. DOE,* 469 F.Supp. 236 (D.Del.1979). I have also held that in order to obtain relief under Section 211 a plaintiff must satisfy the traditional criteria for a preliminary injunction. *Ibid.* The criteria which must be considered in determining whether a plaintiff is entitled to preliminary injunctive relief are (1) the threat of irreparable injury to the plaintiff if the interim relief is denied, (2) possible injury to other parties should the relief be granted, (3) the public interest, and (4) the likelihood that the plaintiff will ultimately prevail on the merits. *See Northern Natural Gas Co. v. DOE,* 464 F.Supp. 1145, 1155 (D.Del.1979). *See also Kansas-Nebraska National Gas Co.,* Case No. 79-4055 (D.Kan. July 31, 1979).

---

**15.** Section 5(a)(3)(A) states, in part, as follows:
Whoever violates . . . any order under this chapter shall be subject to a civil penalty—
(i) with respect to activities relating to the production, distribution, or refining of crude oil, of not more than $20,000 for each violation . . . .

**16.** 10 C.F.R. § 205.203.

**17.** *See* note 12, *supra.*

**18.** Section 211(d)(2) states as follows:
A district court of the United States . . . may enjoin temporarily or permanently the application of a particular regulation or order issued under this title to a person who is a party to litigation before it.

Even if Pennzoil could carry its burden with respect to the first three criteria, I find that it is not entitled to interim relief in this case because it has failed to demonstrate a likelihood that it will prevail on the merits.

■ Pennzoil challenges the validity of Ruling 1975–15 on a number of grounds. First, it asserts, the Ruling is a legislative regulation which substantially changed the definition of property contained in the MPPR. As a result, according to Pennzoil, its promulgation without notice and opportunity for comment violated the rulemaking requirements of the Federal Energy Administration Act ("FEAA") and the Administrative Procedure Act ("APA"). Alternatively, Pennzoil argues that even if Ruling 1975–15 is determined to be an interpretative regulation exempt from the APA's rulemaking requirements, its promulgation without notice and opportunity for comment nevertheless violated the FEAA. Finally, Pennzoil asserts that by purporting to require properties unitized after 1972 to adopt a unit BPCL as of the date of unitization, even if that date preceded the date on which Ruling 1975–15 was promulgated, the Ruling represents an impermissible retroactive regulatory requirement. The DOE responds that Ruling 1975–15 is an interpretative, rather than a legislative, regulation; that the APA does not require agencies to provide notice and an opportunity to comment on interpretative regulations; that the FEAA imposes no rulemaking obligations not imposed by the APA, and that Ruling 1975–15 is not invalid as a retroactive regulatory requirement because it required unit operators to do nothing which they were not already required to do under the MPPR.

The crux of Pennzoil's claims that Ruling 1975–15 was promulgated without the rulemaking procedures required for legislative regulations and that the Ruling imposes retroactive regulatory requirements is its contention that the Ruling is inconsistent with the regulatory definition of property contained in 10 C.F.R. § 212.72. Ruling 1975–15 represents final agency action, and,

as such, it must be upheld unless its issuance "was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful . . . ." *Texaco, Inc. v. Federal Energy Administration*, 531 F.2d 1071, 1076 (Em.App.1976). The burden of proving that Ruling 1975–15 is unlawful under the arbitrary and capricious standard must be borne by Pennzoil. *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1401 (Em.App.1975). That burden is a heavy one where, as here, the challenge is to an agency's purported interpretation of its own regulations. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965).

At this stage of the proceedings Pennzoil has failed to demonstrate a substantial likelihood that it will be able to carry its burden of proving that the DOE acted arbitrarily and capriciously in promulgating Ruling 1975–15. I base this conclusion on the opinion of the Temporary Emergency Court of Appeals in *Grigsby v. DOE*, 585 F.2d 1069 (Em.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979). In *Grigsby*, the operator of a unit formed in 1969 decided in 1974 to terminate crude oil production from what had previously been the unit well and to commence production from a new well drilled on a separate leasehold located in the same unit. Relying on a literal interpretation of 10 C.F.R. § 212.72, *Grigsby* designated the total production from the new well as "new" oil because the well was located on a different lease or fee interest from the original well and because, in his view, the BPCL of the tract on which the new well was located was, therefore, zero. The Temporary Emergency Court of Appeals rejected *Grigsby's* interpretation of Section 212.72:

> Grigsby is incorrect in stating that "property" is measured solely by the fee or leasehold interest. The focus of the "property" definition is upon the "right to produce," not the fee or leasehold nature of the ownership interest. If Grigsby were correct in stating that the nature of the ownership interest alone controlled the definition of "property," a mineral

lessee could evade the price control and allocation programs by pooling his interest with that of neighboring lessees and gerrymandering the situs of the well among the various leaseholds.

*Id.* at 1083.[19] Given the *Grigsby* Court's determination that the key to the property definition in Section 212.72 is the right to produce rather than the nature of the ownership interest, I can hardly say that the similar determination reached by the DOE in Ruling 1975–15 is arbitrary or capricious.

Pennzoil's attempts to distinguish *Grigsby* do not cause me to change my conclusion. Pennzoil correctly notes that the Court in *Grigsby* specifically declined to address the validity of Ruling 1975–15, that issue having been raised for the first time on appeal. *See id.* at 1084 n.1. But, the fact that the Court could infer from Section 212.72 itself that the right to produce is central to the property definition and that, accordingly, a unit operator must employ a unit BPCL only strengthens the conclusion that Ruling 1975–15 is a reasonable interpretation of the regulation. Pennzoil also correctly notes that the unit involved in *Grigsby* was formed before 1972 whereas the Walker Creek Unit was formed in 1974. I do not understand the relevance of this distinction, however, to a determination of the validity of Ruling 1975–15's conclusion that, with respect to unitized operations formed after 1972, the unit defines the property. If, as Pennzoil asserts, Section 212.72 defines property exclusively in terms of lease or fee interests, it would be improper to require use of a unit BPCL by units formed before 1972 as well as units formed thereafter. For the reasons stated in *Grigsby*, I must reject any such argument.

Pennzoil's failure to distinguish *Grigsby* in a manner relevant to this action compels me to conclude that it has not shown a substantial likelihood that it will prevail in its assertion that Ruling 1975–15 is inconsistent with Section 212.72's definition of property. As a consequence, it has failed to show a substantial likelihood that it will succeed in its claim that the Ruling was a legislative regulation promulgated in violation of either the FEAA or the APA. Similarly, it has failed to show that the Ruling imposed obligations on units formed after 1972 not imposed by the regulations themselves. Accordingly, it has also failed to demonstrate a substantial likelihood that it will prevail on its claim that Ruling 1975–15 is invalid and imposes a retroactive regulatory requirement.

Nor is there a likelihood that Pennzoil will prevail in its claim that even if Ruling 1975–15 is an interpretative regulation, the DOE was required, under the FEAA as it existed in August of 1975, to provide notice and opportunity for comment before promulgating it. Pennzoil bases this claim on § 7(i)(1)(A)–(C) of the FEAA, 15 U.S.C. § 766(i)(1)(A)–(C) (repealed by P.L. 95–91).[20]

---

**19.** The Temporary Emergency Court of Appeals ultimately disposed of *Grigsby* based on factual and legal considerations not relevant to the claims raised by Pennzoil in this case.

**20.** Section 7(i)(1)(A)–(C) of the FEAA provided as follows:

(A) Subject to paragraphs (B), (C), and (D) of this subsection, the provisions of subchapter II of chapter 5 of Title 5 shall apply to any rule or regulation, or any order having the applicability and effect of a rule as defined in section 551(4) of Title 5, issued pursuant to this chapter, including any such rule, regulation, or order of a State or local government agency, or officer thereof, issued pursuant to authority delegated by the Administrator.

(B) Notice of any proposed rule, regulation, or order described in paragraph (A) shall be given by publication of such proposed rule, regulation, or order in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; except that the requirements of this paragraph as to time of notice and opportunity to comment may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order. In addition, public notice of all rules, regulations, or orders described in paragraph (A) which are promulgated by officers of a State or local government agency shall to the maximum extent practicable be achieved by publication of such rules, regulations, or orders in a sufficient number of newspapers of statewide circulation calculated to receive widest possible notice.

(C) In addition to the requirements of paragraph (B), if any rule, regulation, or or-

Subsection (A) states that "the provisions of subchapter II of chapter 5 of Title 5, United States Code, shall apply to any rule or regulation, or any order having the applicability and effect of a rule as defined in section 551(4) of Title 5, United States Code, issued pursuant to this Act." Section 551 of Title 5 [21] defines "rule" to include agency statements "of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." Section 7(i)(1)(B) of the FEAA specifies the notice and opportunity to comment which must be provided prior to promulgation of rules, regulations and orders described in Subsection (A). Subsection (C) states that, in addition to the rulemaking requirements set forth in Subsection (B), if a rule, regulation or order described in Subsection (A) "is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses," its promulgation must be preceded by "an opportunity for oral presentation of views, data, and arguments".

It is undisputed that the DOE did not comply with the rulemaking requirements of Section 7(i) before issuing Ruling 1975–15. \Pennzoil argues that if the Ruling is found to be an interpretative regulation, the requirements of Subsection (B) were applicable to it because it constitutes an agency statement "designed to . . . interpret . . . law or policy". Additionally, according to Pennzoil, the requirements of Subsection (C) were applicable because the Ruling was "likely to have a substantial effect on the Nation's economy or large numbers of individuals or businesses". Since the DOE failed to comply with those rulemaking requirements prior to issuing Ruling 1975–15, Pennzoil asserts, the Ruling is invalid.

I am not persuaded that Section 7(i)(1)(A)–(C) applied to Ruling 1975–15. The Temporary Emergency Court of Appeals has explicitly rejected the suggestion that Section 7(i)(1)(A) and (B) of the FEAA imposed rulemaking requirements on interpretative rules not imposed by the APA. *Energy Reserves Group, Inc. v. DOE*, 589 F.2d 1082, 1099 (Em.App.1978). As the Court pointed out in that case, while the definition of "rule" contained in 5 U.S.C. § 551(4) includes interpretative agency statements, it is limited to those statements having a "future effect". Rules which do no more than interpret pre-existing statutes or regulations do not have a future effect. As the Court stated in *Energy Reserves Group* :

> A rule . . . interpreting an existing statute or existing legislative regulation relating in time back to the enactment of the statute or adoption of the regulation is not a rule having a *"future effect"* as defined in § 551(4) Title 5 U.S.C. Therefore, it is not subject to the provisions of § 7(i) of the FEAA. Interpretative rules simply state what the statute or regulation has always meant in the opinion of the administrative agency issuing the interpretative rule.

*Id.* at 1100 (emphasis in original). As I have stated above, Pennzoil has thus far failed to demonstrate that Ruling 1975–15 does anything more than reasonably inter-

der described in paragraph (A) is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, an opportunity for oral presentation of views, data, and arguments shall be afforded. To the maximum extent practicable, such opportunity shall be afforded prior to the issuance of such rule, regulation, or order, but in all cases such opportunity shall be afforded no later than forty-five days after the issuance of any such rule, regulation or order. A transcript shall be kept of any oral presentation.

**21.** Section 551(4) of Title 5 states as follows:

"rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]

pret 10 C.F.R. § 212.72. Under the rationale of the *Energy Reserves Group* case, then, it has no "future effect", is not included in the definition of "rule" contained in 5 U.S.C. § 551(4), and is not subject to the rulemaking requirements of Section 7(i)(1)(A) and (B) of the EPAA.

The Temporary Emergency Court of Appeals did not specifically address the applicability of Section 7(i)(1)(C) of the EPAA to interpretative regulations in the *Energy Reserves Group* case. By its terms, however, Subsection (C) applies only to rules, regulations and orders described in Subsection (A). For the reasons stated in the preceding paragraph Ruling 1975–15 is not such a rule, regulation or order. Moreover, the *Energy Reserves Group* case suggests that Subsection (C) would not apply to Ruling 1975–15 in any event because the Ruling does not have a "substantial impact". This conclusion follows from the fact that Pennzoil has yet to show that Ruling 1975–15 is not a reasonable interpretation of the property definition contained in 10 C.F.R. § 212.72. In *Energy Reserves Group* the Court stated that a reasonable administrative interpretation of a pre-existing statute or regulation has "no impact. In that event the impact came from the statute and valid legislative regulation being interpreted, not from the interpretative ruling." *Id.* at 1098.

In sum, Pennzoil has failed at this point to show a likelihood that it will ultimately prevail on its claim that in promulgating Ruling 1975–15 the DOE acted arbitrarily or capriciously or in violation of applicable rulemaking requirements. In light of this failure to demonstrate a probability of success on the merits, Pennzoil has not shown that it is entitled to a tolling of penalties accruing under the EPAA and regulations promulgated thereunder.

Finally, Pennzoil argues that a refusal to toll penalties in this case would be particularly unjust because it "does not actually have the option of 'compliance' with Ruling 1975–15" even if it were disposed to do so. Pennzoil bases this contention on what it views as the DOE's confusing and contradictory pronouncements, since Ruling 1975–15 was issued, regarding the obligation of unit operators to employ a unit BPCL.

As I have stated, Ruling 1975–15 seemed to require unit operators to adopt a unit BPCL as of the date the unit was formed. On February 1, 1976, however, the DOE stated that Ruling 1975–15 was rescinded *ab initio* to the extent it required unit operators to employ a unit BPCL as of the effective date of unitization. 41 Fed.Reg. 4931, 4937 (Feb. 3, 1976). Instead, it stated, operators of units formed after 1972 would not be required to adopt a unit BPCL until a "significant alteration in pre-unitized producing patterns" has occurred or until "enhanced recovery operations" have been started. *Ibid.* On August 20, 1976, the DOE issued clarifications to the MPPR to take effect September 1, 1976, 41 Fed.Reg. 36172 (Aug. 26, 1976). In those clarifications the DOE defined "significant alteration in producing patterns" for the first time. *Id.* at 36184. On January 19, 1977, the DOE issued Ruling 1977–2. 42 Fed. Reg. 4409 (Jan. 25, 1977). In that Ruling the DOE reiterated its position that units, like Walker Creek, formed prior to the DOE's adoption of unit BPCL regulations in 1976 were subject to the requirements of Ruling 1975–15, as modified on February 1, 1976. "Accordingly, all such units . . . were required to calculate a BPCL by aggregating the BPCL's of all participating properties at such time as significant changes in the unit's producing patterns occurred." *Id.* at 4415. Recognizing that "significant alteration in producing patterns" was not defined until September 1, 1976, and that that definition was not directly applicable to units required to establish a unit BPCL before the DOE's issuance of unit BPCL regulations in 1976, the DOE stated that

that definition will be considered as guidance in audits and compliance cases in determining whether a significant alteration has occurred with respect to such units. [DOE] will, however, on a case-by-case basis, permit unit operators to justify the establishment of the date of significant alteration in producing patterns in

such units on reasonable bases other than those specified by the present definition. *Ibid.*

Based on the foregoing regulatory history, I am not persuaded that Pennzoil is unable to comply with the MPPR, as subsequently interpreted by the DOE. Under the regulatory framework Pennzoil has had the option of establishing a unit BPCL as of the effective date of unitization of Walker Creek, May 1, 1974, or the date on which a significant alteration in producing patterns occurred. The possibility that the DOE may have disagreed with Pennzoil's application of the regulatory requirements to the Walker Creek Unit cannot be said to have made compliance impossible any more than that possibility, which is always present, makes compliance with all regulatory requirements impossible. Nor was compliance made impossible by the fact that, by complying, Pennzoil would have lost revenues which it could not have subsequently recovered if and when the regulatory requirements were declared invalid. If the mere possibility that regulations will in the future be found invalid could excuse present and past noncompliance, no agency could enforce its regulations before obtaining a judicial declaration of their validity.

## IV.  CONCLUSION.

Based on the foregoing, the DOE will be permitted to join the United States as a counterclaiming party defendant. In addition, because Pennzoil has failed to make the showing required to obtain interim relief, and because it has failed to show that compliance with the DOE's regulations has been impossible, the accrual of civil penalties, which may be imposed following the termination of this litigation, will not be stayed or tolled *pendente lite*.