**PENNZOIL COMPANY, Plaintiff,**

v.

**DEPARTMENT OF ENERGY et al., Defendants.**

Civ. A. No. 78–335.

United States District Court, D. Delaware.

May 18, 1981.

As Modified June 3, 1981.

Bruce M. Stargatt, Jack B. Jacobs of Young, Conaway, Stargatt & Taylor, Wilmington, Del., John P. Mathis, Randolph Q. McManus of Baker & Botts, Washington, D. C., Perry O. Barber, Jr., James W. Shaddix, Jay G. Martin, Pennzoil Co., Houston, Tex., for plaintiff.

James W. Garvin, Jr., U. S. Atty., Peggy L. Ableman, Asst. U. S. Atty., Wilmington, Del., Larry P. Ellsworth, Dan F. Shea, Ellen P. Rosenberg-Blatt, Dept. of Energy, George Kielman, Dean S. Cooper, Gilbert T. Renaut, Washington, D. C., for defendants.

## MEMORANDUM OPINION

STAPLETON, District Judge:

Plaintiff Pennzoil Company ("Pennzoil") brought this action against the Department of Energy and the Secretary of Energy (collectively "DOE") to obtain a judicial determination of the validity of DOE Ruling 1975–15 as applied to its Walker Creek field which was unitized on May 1, 1974. The case is presently before me on cross motions for summary judgment. All of the facts necessary to the determination of these motions are set forth in two prior opinions of this Court [1] and need not be repeated here.

Pennzoil asserts that Ruling 1975–15 is a "legislative rule representing a substantive policy choice". As a consequence, it is said, Ruling 1975–15 could not have been adopted in compliance with the Administrative Procedure Act and the Federal Energy Administration Act without notice and opportunity for comment. I cannot accept this argument, however, because it has been determined, authoritatively as far as this Court is concerned, that Ruling 1975–15, in the respects here challenged, effected no change in the pre-existing law.

In *Grigsby v. Department of Energy*, 585 F.2d 1069 (TECA 1978), *cert. denied* 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979), the plaintiff operator of a unit formed in 1969 decided on October 14, 1974 to terminate crude production from what had previously been the unit well and to commence production from a new well drilled on a separate leasehold located within the same unit. Thereafter, it was determined that there were two distinct reservoirs in the field and the Louisiana Commission of Conservation issued orders on June 24, 1976 recognizing the two separate reservoirs and unitizing the newly discovered reservoir. Grigsby's new well was designated as the unit well for one of the newly constituted units in the newly discovered reservoir.

Commencing in October of 1974, Grigsby designated the total production from the new well as "new oil". He had two arguments to support this position. First he asserted that, under the definition of property found in Section 212.72 of the Regulation in 1974, the lease on which the new well was located defined the relevant property. Second, he argued that, even if the units created under state law defined the relevant property, there had been a new unit created after October 14, 1974 which had a zero base production control level ("BPCL").

As I observed in my earlier opinion, the Temporary Emergency Court of Appeals made short shrift of Grigsby's first argument:

Grigsby is incorrect in stating that "property" is measured solely by the fee or leasehold interest. The focus of the "property" definition is upon the "right to produce," not the fee or leasehold nature of the ownership interest. If Grigsby were correct in stating that the nature

---

[1]  466 F.Supp. 238 (D.Del.1979) and 480 F.Supp. 1126 (D.Del.1979).

of the ownership interest alone controlled the definition of "property," a mineral lessee could evade the price control and allocation programs by pooling his interest with that of neighboring lessees and gerrymandering the situs of the well among the various leaseholds.

The "right to produce" arises from a combination of sources, including, but not limited to, the nature of the ownership interest, contractual extension or restriction of ownership interest, and orders of state regulatory agencies. A mineral fee owner has a "right to produce" subject to state law. A mineral leasehold owner has a "right to produce" subject to the terms of the lease and state law. The mineral leasehold owner's "right to produce" may be further circumscribed by voluntary or compulsory pooling. Although the fee or leasehold interest may be the origin of the "right to produce", such a "right to produce" is controlled, limited, or extended by contractual agreement and state authorities....

585 F.2d at 1083.

On its face, this holding would seem to foreclose anyone operating a unitized property from determining "new oil" on the basis of a comparison between current production on individual leases subject to the unitization agreement or order and the 1972 production from those individual leases. Pennzoil suggests, however, that the Grigsby holding is limited to units created before 1972 and urges a construction of Section 212.72 which would look only to rights to produce as they existed in 1972 in order to define the scope of the relevant property.

There is nothing in TECA's analysis of Grigsby's first argument which would support the distinction Pennzoil seeks to make. Moreover, its *holding* with respect to Grigsby's second argument is irreconcilable with its theory.

The court in *Grigsby* initially summarized and commented upon Grigsby's second argument as follows:

Grigsby argues that the Robert Leger Well No. 1 [the new well] production could not have been subject to the same "right to produce" as the Lucky Strike Well No. 1 [the original well] production, because the orders of the Louisiana Commissioner of Conservation unitizing the Heywood Sand, Reservoir A, Sand Unit B, from which the Lucky Strike Well No. 1 produced did not and could not include within the unitized area the reservoir from which the Robert Leger Well No. 1 produced.

The premise of Grigsby's argument, that unitization is the source of the "right to produce" and, hence, the unitized premises defines the property, is correct where mineral fee or leasehold interests have been aggregated by unitization....

*Id.* TECA then went on to hold that a new unit, and, accordingly, a new "right to produce" had been created after 1972 and at least before June 24, 1976:

It is beyond dispute that the Robert Leger Well No. 1 [new well] production was officially recognized as production beyond the Heywood Sand, Reservoir A, on June 24, 1976, when the Louisiana Commissioner of Conservation issued two orders recognizing two separate reservoirs in the North Jennings Field and unitizing the newly discovered reservoir. The unitization of the *Upper* Heywood "A" Sand, Reservoir A, Sand Unit B, and the designation of the Robert Leger Well No. 1 as the unit well, in Order No. 464–K, gave rise to a new "right to produce" and, thus, a new "property," under Ruling 1975–15. Accordingly, we hold that Grigsby was authorized to charge "new oil" prices for the Robert Leger Well No. 1 [new well] production from the Upper Heywood RA SU B as of June 24, 1976.

(Emphasis added). *Id.* at 1085.

The recognition that "rights to produce" can be created by unitization orders entered after 1972 is, of course, inconsistent with Pennzoil's argument that Section 212.72 froze "property" boundaries as they existed in 1972. It is true that the *Gribsby* opinion can be read to suggest that the result with respect to the period after June 26, 1976 was dictated, not by Section 212.72 of the

Regulations, but rather by Ruling 1975–15 which had become effective in August of 1975. This fact does not aid Pennzoil, however, because the *Grigsby* court held that, depending on what the lower court might find to have been the status of the new well's production under Louisiana law between October 1974 and June 1976, there might have been a new "right to produce" created in 1974.[2] *Id.* at 1085–86.

Pennzoil suggests that the *Grigsby* court did not have the benefit of all the legislative history and contemporaneous construction evidence which Pennzoil has marshalled in this case, and asks me to reexamine the issues resolved in *Grigsby*. Whatever may or may not have been before TECA in the *Grigsby* case, however, it is not my function to reconsider square holdings of that court.

Since Ruling 1975–15 effected no change in the law so far as Pennzoil's Walker Creek field is concerned, the failure of the DOE to follow the notice and comment procedure is of no consequence and Pennzoil's procedural invalidity argument must be rejected.

SUBMIT ORDER.

---

**2.** The *Grigsby* case was recently reaffirmed by TECA in *Sauder v. DOE,* 648 F.2d 1341 (Em.App. 1981).